NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3730-10T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAYMOND E. TROXELL,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

February 13, 2013

APPELLATE DIVISION

Submitted March 5, 2013 — Decided February 13, 2014

Before Judges Messano, Lihotz and Ostrer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 09-02-0348.

Joseph E. Krakora, Public Defender, attorney for appellant (Jacqueline E. Turner, Assistant Deputy Public Defender, of counsel and on the brief).

Bruce J. Kaplan, Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

MESSANO, P.J.A.D.

    Defendant Raymond E. Troxell was indicted by the Middlesex County grand jury for the first-degree murder for hire of his

business partner, Vincent Russo, <u>N.J.S.A.</u> 2C:11-3(a)(1) or (2), -3(b)(4) and -3(b)(4)(e). Co-defendant, Frank Marsh, was charged in the same indictment with the first-degree purposeful or knowing murder of Russo, <u>N.J.S.A.</u> 2C:11-3(a)(1) or (2), -3(b)(4) and -3(b)(4)(d); second-degree possession of a weapon for an unlawful purpose, <u>N.J.S.A.</u> 2C:39-4(a); and second-degree unlawful possession of a weapon, <u>N.J.S.A.</u> 2C:39-5(b). Defendant was tried separately from Marsh and found guilty by the jury. The jury also answered two specific interrogatories in the affirmative, compelling a mandatory sentence of life without parole, pursuant to <u>N.J.S.A.</u> 2C:11-3(b)(4). Defendant raises the following arguments on appeal:

POINT I

THE DEFENDANT'S VIDEOTAPED STATEMENT WAS THE PRODUCT OF PSYCHOLOGICALLY COERCIVE INTERROGATION. <u>U.S. Const.</u> Amends. V, XIV; <u>N.J.R.E.</u> 503.

POINT II

THE JUDGE ERRED IN ADMITTING EVIDENCE OF THE CO-DEFENDANT'S OWNERSHIP OF A NUMBER OF LEGAL GUNS, AS PROOF OF THIS OWNERSHIP WAS IRRELEVANT AND WAS AN IMPROPER COMMENT ON THE EXERCISE OF A CONSTITUTIONAL RIGHT[.] <u>U.S. Const.</u> Amends. II, VI, XIV; <u>N.J. Const.</u> Art. I, para. 10. (Not Raised Below)

POINT III

THE TRIAL JUDGE ERRED IN FAILING TO TELL THE JURY THAT A FINDING ON THE TRIGGERING FACTOR, MURDER FOR HIRE, MUST BE UNANIMOUS

AND, IF NOT, A VALID VERDICT WOULD STAND.
(Not Raised Below)

In a pro se supplemental brief, defendant raises the following points:

POINT I

DEFENDANT'S STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED AS HE DID NOT KNOWINGLY OR VOLUNTARILY WAIVE HIS RIGHT TO REMAIN SILENT . . . .

POINT II

DEFENDANT'S STATEMENT MUST BE SUPPRESSED AS THE POLICE FAILED TO SCRUPULOUSLY HONOR HIS RIGHT TO REMAIN SILENT . . . .

POINT III

THE ADMISSION OF EVIDENCE OF FRANK MARSH'S INVOLVEMENT IN THE INSTANT TRIAL IMPERMISSIBLY LOWERED THE STATE'S BURDEN OF PROOF ON THE MATERIAL ELEMENTS OF THE CRIME CHARGED AND RESULTED IN A FLAWED JURY INSTRUCTION[,] THEREBY DENYING DEFENDANT HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . .

POINT IV

THE ADMISSION OF EVIDENCE OF FRANK MARSH'S INVOLVEMENT IN THE INSTANT TRIAL IMPERMISSIBLY CREATED A CONFLICT OF INTEREST BY FORCING DEFENDANT'S COUNSEL TO ALSO HAVE TO DEFEND HIS CLIENT'S CO-DEFENDANT DESPITE SEVERED TRIALS; THEREBY DENYING DEFENDANT HIS DUE PROCESS RIGHTS TO A FAIR TRIAL, AND EFFECTIVE ASSISTANCE OF COUNSEL . . . .

Having considered these arguments in light of the record and applicable legal standards, we affirm.

In summer 2008, defendant and Russo opened an Italian deli, Mezzaluna, in North Brunswick. Paul Scala, who owned a bakery next door, was instrumental in introducing the two men to each other. Russo, who lived on Staten Island, was "like a brother to [Scala]," and defendant was his "good friend[]." Soon after the business opened, however, defendant began complaining to Scala that, despite the fledgling business's financial problems, Russo was compensating himself and not contributing to the workload.

The complaints worsened as the months passed, and, on one occasion, defendant told Scala that "if he (Russo) takes another . . . dime[,] my friend . . . will go in there and shoot him in the back of the store in the head." On another occasion, defendant told Scala he had some "crazy friend . . . from Edison" who would "do the job." On a third occasion, defendant told Scala, "I'll kill that mother f------, I got a guy for [$]3000 [who] is going to shoot him[.]" Scala told Russo, who brushed off the threats, saying Scala was "paranoid" and defendant "talk[ed] too much."

Other witnesses called by the State testified to the animosity between defendant and Russo over the operation of the business. Mezzaluna's cook, Anthony Agostino, identified notes

left by defendant for Russo, threatening legal action and complaining about Russo talking money from the business.

At approximately 6:30 a.m. on December 16, 2008, North Brunswick Township police officer Robert Frangella was dispatched to Mezzaluna. All the doors were locked, but Frangella noted a Jeep with New York license plates parked in the rear. Shortly thereafter, Agostino arrived and opened the front door. Frangella found Russo's lifeless body near the back office door, on its knees and slumped over a box. It was "ice cold" and exhibited "lividity." No spent bullet casings were found at the scene, and a bottle containing Oxycontin was found on a table near the body.

It was estimated that Russo had been dead for approximately twelve hours. Although not initially clear what caused Russo's death, the medical examiner determined at autopsy that Russo died from a single gunshot wound to the head fired from a distance of four to six inches. The medical examiner opined it was most likely that Russo was shot while sitting in the chair in his office. Russo may have survived the shooting for a short period of time, during which he would still have had limited movement.

John Kissel testified that defendant was "one of [his] best friends," the two having both grown up together in Edison. They

both knew co-defendant Marsh, who was also from Edison.  Kissel owned Alpha Cab Company (Alpha Cab), and both defendant and Marsh worked at Alpha Cab at the time of the murder.  Defendant complained about Russo and offered Kissel $3000 to kill Russo; Kissel refused.  Kissel testified that defendant talked about killing Russo in Marsh's presence, but Kissel did not know whether the two discussed the issue outside his presence.

Kissel testified that on December 15, 2008, at approximately 7:00 p.m., Marsh came to his office at Alpha Cab. Following a brief conversation, the substance of which was not admitted before the jury, Kissel went to Mezzaluna and saw Russo's Jeep parked in the back.  Kissel called defendant and met him in the parking lot of a Walmart in North Brunswick. Kissel "told [defendant] that [Russo] was dead."  Defendant was "[s]tunned a little bit."  Kissel and defendant then went to defendant's house, and, at some point, Kissel saw defendant "holding a wad" of cash.  Marsh arrived at defendant's house and stayed "[m]aybe [fifteen] minutes" before leaving.  Kissel did not see defendant give the money to Marsh.

Kissel and defendant went to a bar around 11:00 p.m., and Marsh arrived a short time later.  Angela Cusamano, a barmaid, testified that the three men were there, and videotapes from surveillance cameras at the bar corroborated the meeting.  Cell

A-3730-10T2

phone records also revealed that defendant and Marsh spoke to each other numerous times on December 15. Defendant also called Marsh shortly after leaving the bar, at approximately 12:47 a.m. on December 16. Marsh called defendant later that afternoon, but, the call went directly to defendant's voice mail. At the time, defendant was being interviewed by investigators. Within thirty minutes of completing the interview, cell phone records revealed that defendant called Marsh and spoke to him for several minutes.

Bill Unger, a dispatcher and driver at Alpha Cab, saw defendant and Marsh speaking together outside the cab company on the afternoon of December 15. Unger, a gun enthusiast, testified that Marsh previously had shown him a "two-shot derringer" he owned.[1] Marsh showed Unger the "very large" ".357" bullets that the derringer used and left one in the cab company's office "as a souvenir . . . ." Subsequent testimony by the State's ballistics expert revealed that this caliber bullet was consistent with the projectile fragments recovered from Russo's body at autopsy. The bullet that produced the fragments could have been fired from a derringer.

---

[1] A derringer is a "short-barreled pistol having a large bore." Webster's New College Dictionary 306 (2 ed. 1999).

Charles Chicarella, a friend of Marsh, testified that he was trying to obtain some Oxycontin on December 15, 2008, but Marsh claimed he had none. However, late in the evening, at around 10:00 p.m., Marsh arrived at Chicarella's house and gave him two pills. Chicarella testified the pills looked the same as those in the bottle found by Russo's body.

Defendant was interviewed by Investigator Paul Miller of the Middlesex County Prosecutor's office on December 16, 2008. A formal statement was videotaped and played for the jury. Miller interviewed defendant again on December 18, 2008, after having interviewed Kissel and other witnesses. Defendant acknowledged saying months earlier that he "wish[ed] [Russo] wasn't around." But, defendant claimed he did not know Marsh would actually take him seriously and kill Russo. When Marsh came to his house to be paid, defendant gave Kissel $3000 and told him to give it to Marsh out of fear. The second statement was videotaped and played for the jury.

Marsh lived in Macungie, Pennsylvania. On December 19, Miller and other law enforcement officers executed a search warrant at Marsh's home and seized various firearms and ammunition. Also found was an empty American Derringer "gun box."

While in the Middlesex County Correctional Center awaiting trial, defendant approached David Stankovits, a fellow inmate, and asked him "to testify on [defendant's] behalf." Stankovits told the jury that defendant asked him to tell police that, on December 15, while Stankovits was selling drugs near Scala's bakery, he saw a large man exit a car and enter Mezzaluna through the rear door. In exchange for this testimony, defendant promised Stankovits $1000 and "goodies in jail."

> [At the court's direction, Sections II
> and III of its opinion have been
> redacted from the published opinion
> because they do not meet the criteria
> set by R. 1:36-2(d) for publication.]

IV.

Finally, we consider defendant's contention that the judge failed to properly instruct the jury that it must return a unanimous verdict as to any "triggering" factor -- a finding that would make defendant eligible for a mandatory sentence of life imprisonment without parole. See N.J.S.A. 2C:11-3(b)(4). Defendant also posits a more subtle argument.[2] Analogizing to prior death penalty jurisprudence, he argues that the judge should have told the jurors they were free to return a non-unanimous verdict on the triggering factor. He contends this

_____

[2] We asked defendant and the State to supplement their original briefing on this point and now consider the arguments presented.

failure amounts to plain error, because had the jury been properly instructed and returned a non-unanimous verdict on the triggering factor, he would not have faced a mandatory life sentence without parole.

The State contends that prior jurisprudence is inapplicable in light of the Legislature's repeal of the death penalty and adoption of significant statutory amendments in 2007. The State further argues that, even if it was error to omit a non-unanimity instruction, we must conduct our review under the plain error standard, since defendant did not object. See e.g., State v. Singleton, 211 N.J. 157, 182 (2012) ("Appellate review applies the plain-error standard when a defendant fails to object to a given jury charge."). Under the unique facts of the case, the State contends any error was not "clearly capable of producing an unjust result." R. 2:10-2. Lastly, the State notes that if we conclude it was plain error to omit such an instruction, only defendant's sentence is affected, and we should remand for imposition of a sentence in accordance with N.J.S.A. 2C:11-3(b)(1), and the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA).

A.

Pursuant to amendments enacted by the Legislature in 2007, New Jersey's death penalty was repealed and "replace[d] . . .

with life imprisonment without eligibility for parole in certain circumstances." See Senate Comm. Statement to Senate Comm. Substitute for S. Nos. 171 and 2741 (May 10, 2007), enacted as L. 2007, c. 204 (Dec. 17, 2007) (the 2007 amendments). Under the present statutory scheme, "a person convicted of murder shall be sentenced . . . to a term of 30 years, during which the person shall not be eligible for parole, or . . . to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole." N.J.S.A. 2C:11-3(b)(1).

However, if the State proves one of several "triggering factors," a defendant is eligible for a mandatory sentence of life imprisonment without parole. N.J.S.A. 2C:11-3(b)(4) sets forth one such triggering factor: a defendant convicted of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) or (2), becomes eligible for a mandatory sentence of "life imprisonment without . . . parole" if he, "as an accomplice[,] procured the commission of the offense by payment or promise of payment of anything of pecuniary value." Ibid.

In order for defendant to have been eligible for a mandatory life sentence without parole in this case, the jury was specifically required to unanimously decide that defendant knowingly or purposely caused the death of Russo as Marsh's

accomplice, and that the State had proven the triggering factor, i.e., as an accomplice, defendant procured the commission of Russo's murder with payment, or promise of payment, to Marsh.

Once eligible, a mandatory sentence of life imprisonment without parole must be imposed "if a jury finds beyond a reasonable doubt that any of" certain "aggravating factors exist." Ibid. One aggravating factor is that "[t]he defendant procured the commission of the murder by payment or promise of payment of anything of pecuniary value." N.J.S.A. 2C:11-3(b)(4)(e).[3] As one noted commentator has explained:

> Like the death penalty it replaced, the sentence of life imprisonment without parole requires two separate findings: first, that the murderer is eligible for the sentence based on the particular circumstances of the

---

[3] A similar redundancy between the "murder for hire" triggering factor and aggravating sentencing factor existed in N.J.S.A. 2C:11-3 prior to the 2007 amendments. See former N.J.S.A. 2C:11-3(c) and -3(c)(4)(e). In State v. Ramseur, 106 N.J. 123, 188 (1987), the Court explained:

> There is one class of murder in which a factor defines both death eligibility as well as selection for the penalty itself. The defendant who pays another to commit knowing or purposeful murder and is therefore death eligible (Sec. c) will, without proof of any further aggravating factor (since such payment itself is an aggravating factor, Sec. c(4)(e)), be subject to the death penalty if that aggravating factor outweighs any mitigating factors.

crime; and, second, that the murder involved one or more aggravating factors.

> [Cannel, <u>New Jersey Criminal Code Annotated</u>, comment 7 on <u>N.J.S.A.</u> 2C:11-3 (2013).]

The record reflects that in this case the judge reviewed his charge with the attorneys at length. Defense counsel agreed not only to the charge, but also to the proposed interrogatories on the verdict sheet. At the beginning of the instructions, and before explaining the verdict sheet, the judge explicitly told the jury that its verdict must be unanimous. The first question on the verdict sheet asked whether defendant was guilty as an accomplice to Russo's murder; the second question asked whether defendant was guilty of "procur[ing] the murder by payment of money to Frank Marsh." The court again reminded the jury that its verdict had to be unanimous at the conclusion of the charge.

After the jury announced its unanimous verdict regarding the first two questions, the judge told the jury to

> return . . . to the jury room and consider again whether the State has proven the aggravating factor that Raymond Troxell procured the murder of Vincent Russo by payment or promise of payment of money to Frank Marsh.

The court again instructed the jury that its "verdict in this regard must be unanimous." A special interrogatory was submitted to the jury, asking whether defendant "procured the murder of . . . Russo by payment or promise of payment of money

13

to Frank Marsh[.]"  The jury returned a unanimous verdict as to the aggravating sentencing factor.[4]

---

[4] Because the issue is not squarely before us, we do not decide whether this second "penalty" phase was required under the particular facts of this case, i.e., where the triggering factor and the aggravating sentencing factor were the same.  As noted, the Court in Ramseur, supra, 106 N.J. at 188, implied that in such circumstances, a guilty verdict as to the "death eligible," i.e., triggering, factor would "without proof of any further aggravating factor (since such payment itself is an aggravating factor . . .) . . . subject [a defendant to] the death penalty if that aggravating factor outweighs any mitigating factors." But later, again considering the same aggravating factor, the Court held:

> [T]rial courts in future capital cases in which this issue arises should explicitly inform the penalty-phase jury that . . . the guilt and sentencing phases are considered as separate proceedings. Hence, the jury in the penalty phase should be informed of its duty to deliberate anew concerning any facts established by the verdict in the guilt-phase determination that the State relies on to prove an aggravating factor, and of its right to reach a different conclusion concerning such facts in the penalty phase.
>
> [State v. Marshall, 123 N.J. 1, 139 (1991).]

In State v. Josephs, 174 N.J. 44, 114 (2002), the Court accepted the argument that the penalty-phase jury "should . . . be[] given an opportunity to consider anew the evidence" supporting the aggravating sentencing factor "and to view it from a different perspective than that of the guilt-phase jury."  The Court explained that, if "[p]roperly instructed[, the] penalty-phase jury could have concluded that the . . . aggravating factor should have been accorded less weight in the balancing process" required to determine whether the defendant was to be sentenced to death.  Ibid.
However, after the 2007 amendments, "the presence or absence of mitigating factors is not considered at all."
(continued)

Any claim that the jury was not provided adequate instructions regarding the need for unanimity of its verdicts regarding defendant's guilt as Marsh's accomplice, the triggering factor of procuring Russo's murder and the aggravating sentencing factor is clearly without merit. R. 2:11-3(e)(2).

## B.

The more difficult issue is whether the judge was required to tell the jury it could return a non-unanimous verdict on the triggering factor. Defendant argues a non-unanimous verdict as to the triggering factor would have been a valid verdict which eliminated the possibility of a mandatory life sentence without parole. Under those circumstances, the judge would have necessarily been required to sentence defendant in accordance with N.J.S.A. 2C:11-3(b)(1) and NERA. See Cannel, supra, comment 7(a) on N.J.S.A. 2C:11-3 ("Where the jury is unable to agree unanimously as to any one of the four triggers, subsection b(4) does not apply, and sentencing of the defendant will be under b(1)."). We now consider the argument.

---

(continued)
Cannel, supra, comment 7 on N.J.S.A. 2C:11-3. It would appear that since the jury already found the triggering factor was proven beyond a reasonable doubt, and without the need any longer to weigh the very same aggravating sentencing factor against mitigating factors, a second "penalty" phase was unnecessary in this case.

15

## Prior Death Penalty Jurisprudence

Prior to the 2007 amendments, a defendant was eligible for the death penalty if, having been convicted of knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1) or (2), the jury unanimously concluded beyond a reasonable doubt that the State proved one of certain triggering factors. These included, among others, that the defendant "committed the homicidal act by his own conduct; or . . . as an accomplice procured the commission of the offense by payment or promise of payment of anything of pecuniary value[.]" Former N.J.S.A. 2C:11-3(c).

If the jury returned a unanimous verdict as to the triggering factor, "a separate sentencing proceeding" was held "to determine whether the defendant should be sentenced to death[.]" Former N.J.S.A. 2C:11-3(c)(1). The State had the burden of proving at least one statutory aggravating factor beyond a reasonable doubt. Former N.J.S.A. 2C:11-3(c)(2)(a), -3(c)(4). The defendant's burden was only to "produc[e] evidence" as to any statutory mitigating factor. Former N.J.S.A. 2C:11-3(c)(2)(a), -3(c)(5).

The statute explicitly provided for three possible verdicts following the sentencing hearing. If the jury were to find that "any aggravating factors exist and that all the aggravating factors outweigh[ed] beyond a reasonable doubt all of the

mitigating factors," the defendant would be sentenced to death. Former N.J.S.A. 2C:11-3(c)(3)(a). If the jury found no aggravating factors existed, or those that existed did "not outweigh all of the mitigating factors," the defendant's life would be spared, and he would be sentenced in accordance with subsection (b) of the statute. Former N.J.S.A. 2C:11-3(c)(3)(b). Finally, defendant would be sentenced pursuant to subsection (b) "[i]f the jury [were] unable to reach a unanimous verdict[.]" Former N.J.S.A. 2C:11-3(c)(3)(c) (emphasis added).

Subsection (b) in turn provided that if the defendant were found to be death-eligible, "and the jury . . . found the existence of one or more aggravating factors, but that such factors did not outweigh the mitigating factors . . . or the jury was unable to reach a unanimous verdict as to the weight of the factors, the defendant [was to] be sentenced . . . to a term of life imprisonment" without parole. Former N.J.S.A. 2C:11-3(b)(4) (emphasis added). In 1985, the Legislature amended the statute to provide that, "[p]rior to . . . sentencing deliberations," the jury would be informed that "a failure to reach a unanimous verdict [would] result in sentencing by the court," and also be informed "of the sentences which may be imposed." L. 1985, c. 178, § 2; former N.J.S.A. 2C:11-3(f).

The jurisprudence regarding proper jury instructions that arose initially relied exclusively upon the express language of the statute. Providing a non-unanimity instruction in the sentencing phase of a death penalty case was first required in Ramseur. There, citing extensively the language of former N.J.S.A. 2C:11-3(c)(3)(c), and the then-recently enacted former N.J.S.A. 2C:11-3(f), the Court held that "juries in capital cases [must] be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment if, after a reasonable period of deliberations, they are unable to agree." Ramseur, supra, 106 N.J. at 300-01, 312. Accord State v. Bey (II), 112 N.J. 123, 180 (1988) ("To prevent unacceptable speculation about the consequences of a non-unanimous verdict, the court must inform the jury of its option of returning a final, non-unanimous, verdict that would result in a minimum of thirty years of imprisonment without parole."); see also State v. Hunt, 115 N.J. 330, 382-83 (1989) ("In a capital case, unlike the ordinary criminal prosecution, jurors need not reach a unanimous verdict. Thus, a decision not to agree is a legally acceptable outcome, which results not in a mistrial, but in a final verdict.") (emphasis added).

In Bey II, the Court also considered the need for unanimity

regarding the finding of aggravating and mitigating sentencing factors. Firmly tethering its conclusions to the language of the statute, the Court said:

> Although the Act does not expressly require the jury to be unanimous in finding the existence of an aggravating factor or factors, the lack of unanimity suggests that the factor has not been established beyond a reasonable doubt as required by [former] N.J.S.A. 2C:11-3(c)(2)(a). Requiring a unanimous finding on the existence of an aggravating factor is consistent with the general requirement of unanimity in criminal cases . . . . The unanimity requirement extends only to verdicts adverse to the defendant, and the Legislature may provide for the return of a verdict favorable to the defendant on less than unanimity. For example, under the Act, the unanimity requirement redounds to the benefit of the defendant by mandating that he or she must be sentenced to imprisonment rather than death unless the jury is unanimous on the imposition of the death penalty.[5]
>
> [Bey II, supra, 112 N.J. at 159 (citations to out-of-state authority omitted) (emphasis added).]

Because the statute only required a defendant to "produc[e] evidence of the existence of a mitigating factor," former

---

[5] Of course, the statutory provision requiring imposition of a sentence other than death if the jury could not reach unanimity was also "favorable" to the defendant because it eliminated "the customary practice in criminal trials that a hung jury results in a mistrial, after which the State has the option of instituting new proceedings against the defendant" and again seeking the maximum penalty. State v. Brown, 138 N.J. 481, 512-13 (1994).

N.J.S.A. 2C:11-3(c)(2)(a), "jurors need not unanimously find the existence of a mitigating factor." Id. at 159. As a result, "[a]ny juror who believes in the existence of a mitigating factor must be allowed to determine whether he harbors such a [reasonable] doubt by conducting his or her own weighing process." Id. at 160. Jury instructions advising jurors they must unanimously agree as to any mitigating factor were, therefore, improper and required reversal. Id. at 160-61.

The Court first extended the requirement of a non-unanimity instruction to the guilt phase of a capital case in Brown. There, the defendant argued "that the court should have instructed the jury . . . to decide only whether it unanimously found beyond a reasonable doubt that [he] had committed the murders by his own conduct," the death penalty triggering factor, thereby "informing the jury that a non-unanimous verdict on that issue was acceptable and would not affect the murder conviction." Brown, supra, 138 N.J. at 509. The Court decided that

> [a]lthough a jury verdict that a defendant
> committed a murder by his own conduct must
> be unanimous, unanimity is not required to
> support a verdict that a defendant guilty of
> murder did not commit the murder by his own
> conduct. Rather, the inability of the jury
> to reach a unanimous decision on the own-
> conduct determination constitutes a final
> verdict. . . .

20                                                    A-3730-10T2

[<u>Id.</u> at 511.]

The Court further explained:

> We acknowledge that the death-penalty statute does not expressly provide for a non-unanimous option in regard to the own-conduct determination, although it specifically authorizes a non-unanimous verdict with respect to the weighing of aggravating and mitigating factors. [Former] <u>N.J.S.A.</u> 2C:11-3(c)(3)(c). Nevertheless, the considerations underlying the legislature's express recognition of non-unanimous verdicts in the penalty phase to determine whether a defendant receives a life or death sentence apply with equal force when a jury that has convicted a defendant of murder decides whether that defendant committed the murder by his own conduct. . . . [W]hen a jury in a capital case decides whether a defendant committed the homicide "by his own conduct," its determination establishes whether that defendant will be eligible for the death penalty. Although the consequences of the own-conduct determination and the penalty-phase verdict are not identical, the analogy is compelling. In the context of determining whether a jury should be informed of its non-unanimous option, any distinction is inconsequential.
>
> [<u>Id.</u> at 516-17.]

"[T]he significance of the own-conduct determination in triggering the penalty phase supports the conclusion that jurors must be instructed on the nonunanimity option." <u>Id.</u> at 518.

In <u>State v. Mejia</u>, 141 <u>N.J.</u> 475, 486 (1995), the Court extended this rationale to the then-death-penalty-triggering factor that the defendant acted with "intent to kill," as

opposed to with an intent to cause serious bodily injury that resulted in death. The Court reasoned, "[l]ike the 'by your own conduct' requirement, the 'intent to kill' requirement is not an element of the offense of murder [but is] merely a triggering device for the death-penalty phase of the trial." Ibid. (citations and internal quotation marks omitted) (alteration in original). Therefore, it was reversible error for the judge to have failed to "inform the jurors they ha[d] an option to return a non-unanimous, or reasonably-doubtful, finding on the distinction between the intent to kill and to cause serious bodily injury." Id. at 487.[6]

As a result, the model jury charges used in death penalty prosecutions included a non-unanimity instruction regarding the finding of a triggering event. For example, in a murder-for-hire death penalty prosecution, judges were required to give the following instruction:

> Before you may conclude that defendant procured the murder as an accomplice by payment or promise of payment to another, you must be unanimously convinced of that

---

[6] In State v. Gerald, 113 N.J. 40, 89 (1988), the Court concluded that under the New Jersey Constitution it was cruel and unusual punishment to impose the death penalty when the actor's intent was only to cause serious bodily injury. The constitutional amendment that overturned Gerald had not taken effect when the events in Mejia occurred. State v. Cooper, 151 N.J. 326, 362 (1997), cert. denied, 528 U.S. 1084, 120 S. Ct. 809, 154 L. Ed. 2d 681 (2000).

beyond a reasonable doubt.  If you have a reasonable doubt on this issue <u>or if you are unable to reach a unanimous decision beyond a reasonable doubt as to whether defendant was an accomplice who brought the murder about by payment or promise of payment to another as distinguished from a mere accomplice, that is a permissible final verdict on this issue that would result in the imposition of a non-capital sentence for murder</u>. . . .

[<u>Judges Bench Manual for Capital Causes</u>, "Supplemental Charge on Accomplice Who Hired Another (To Resolve the 'Trigger' Issue Where Own Conduct <u>Not</u> in the Case," (Jan. 1, 2005) (emphasis added).]

### The 2007 Amendments

In January 2006, the Legislature established the New Jersey Death Penalty Study Commission (the Commission).  <u>See</u> <u>L.</u> 2005, <u>c.</u> 321 (effective January 12, 2006).  The Commission was charged with "study[ing] all aspects of the death penalty as currently administered in the State of New Jersey[,] . . . propose new legislation, if appropriate[, and] report its findings and recommendations to the Governor and the Legislature, along with any legislation it desires to recommend for adoption by the Legislature[.]"  <u>Id.</u> at §§ 2(b), 2(c), and 2(k).

In its final report, the Commission "recommend[ed] that the death penalty in New Jersey be abolished and replaced with life imprisonment without the possibility of parole[.]"  <u>New Jersey Death Penalty Study Commission Report</u> (Jan. 2, 2007) at 2.  One

of the Commission's specific findings was that "[t]he alternative of life imprisonment . . . without the possibility of parole would sufficiently ensure public safety and address other legitimate social and penological interests . . . ." <u>Id.</u> at 56. In support of this finding, the Commission noted: "[r]eplacing the death penalty with life without parole would be a certain punishment, not subject to the lengthy delays of capital cases; it would incapacitate the offenders; and it would provide finality for victims' families." <u>Id.</u> at 61.

The Commission's report included recommended legislation. <u>Id.</u> at 68-77. On December 17, 2007, the Legislature approved <u>L.</u> 2007, <u>c.</u> 204, a bill that was "substantially similar to the bill proposed by the . . . Commission . . . ." <u>Senate Judiciary Comm. Statement</u>, <u>supra</u>.

Changes made by the 2007 amendments were sweeping and exceeded mere elimination of the death penalty as a possible sentence. Now, once a triggering factor is found, "a defendant will receive a sentence of life without parole if the State demonstrates beyond a reasonable doubt that one or more of the statutory aggravating factors is present. The amended statute does not permit the defendant to present mitigating factors." <u>State v. Fortin</u>, 198 <u>N.J.</u> 619, 624 (2008) (citation omitted). The Legislature also eliminated the requirement that the jury be

told of the possible sentences that may be imposed.  <u>Compare</u> <u>N.J.S.A.</u> 2C:11-3 with former <u>N.J.S.A.</u> 2C:11-3(f).  Most important to the issue we face, the 2007 amendments completely eliminated any statutory reference to the option of a non-unanimous verdict at any stage of the prosecution.

### C.

We conclude that in this case the judge was not required to provide a non-unanimity instruction regarding the triggering factor that made defendant eligible for a mandatory life sentence without parole.  We reach this decision for several reasons.

We presume that prior to passage of the 2007 amendments, the Legislature was fully aware of not only its prior enactments but also precedent that evolved under the death penalty statute. <u>See e.g.</u>, <u>State v. Greeley</u>, 178 <u>N.J.</u> 38, 46 (2003) ("When ascertaining legislative intent, we can infer that the Legislature was 'familiar with its own enactments, with judicial declarations relating to them, and . . . passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose.'") (quoting <u>State v. Federanko</u>, 26 <u>N.J.</u> 119, 129 (1958)). <u>See also</u> <u>Josephs</u>, <u>supra</u>, 174 <u>N.J.</u> at 139-40 (discussing the Legislature's familiarity with and response to the Court's death penalty jurisprudence).

Our recognition of the Legislature's familiarity with the topic is only strengthened by its initial decision to form the Commission to study the issue and make recommendations. The Commission's recommendations eliminated any statutory references to the validity of non-unanimous verdicts, and the Legislature ultimately adopted, in essence, the Commission's recommendations.

In addition, the entire line of cases that first adopted the requirement of a non-unanimity instruction in the sentencing phase of death penalty cases, and extended that to the guilt phase determination as to a triggering factor, had its genesis in statutory language that has since been repealed. The Brown Court, which first extended the requirement for the charge to the guilt phase, did so only because it found a "compelling" "analogy" between "the consequences" of a jury's decision on a triggering factor "and the penalty-phase verdict[.]" Brown, supra, 138 N.J. at 517-518. Of course, when Brown was decided, the "consequences" of the penalty phase reflected a choice between life and death; the Legislature has now eliminated one of those possible consequences.

Furthermore, it is clear that the Court never grounded its requirement for a non-unanimity instruction in the guilt phase of a capital prosecution upon the State Constitution. Nor could

it have relied upon the federal constitution, because the United States Supreme Court has expressly rejected the claim that a non-unanimity instruction is required in capital sentencing proceedings. Jones v. United States, 527 U.S. 373, 379-84, 119 S. Ct. 2090, 2097-2100, 144 L. Ed. 2d 370, 381-84 (1999). Indeed, the Jones Court specifically disapproved of New Jersey's requirement "that the jury be informed of the sentencing consequences of nonunanimity." Id. at 383, 119 S. Ct. at 2099, 144 L. Ed. 2d at 383 (citing Ramseur, supra, 106 N.J. at 304-315).

Our decision is further supported by the Court's frequent recognition that death was a sentence qualitatively different from all others. See, e.g., Bey II, supra, 112 N.J. at 101 (referring to the death penalty as "'a punishment different from all other sanctions in kind rather than degree'") (quoting Woodson v. North Carolina, 428 U.S. 280, 303-04, 96 S.Ct. 2978, 2991, 49 L. Ed. 2d 944, 961 (1976)). As a result, the Court has described its "capital jurisprudence [as] stressing the importance of providing a jury with every opportunity to spare a defendant's life." Cooper, supra, 151 N.J. at 362.

In Cooper, the defendant argued that Brown and Meija compelled a non-unanimity instruction permitting the jury to return a non-unanimous verdict as between felony murder, to

which the death-penalty did not apply, and knowing and purposeful murder, to which it did. Id. at 357. The Court rejected the argument, noting that "[t]hose cases have been restricted to capital murder," and "decline[d] to extend that jurisprudence to noncapital murder." Id. at 362. "The fundamental difference in nature between a sentence of death and a sentence of life without parole suggests that, where the jurisprudence differs between death penalty cases and subsection b(4) cases, it will be to remove protections put in place by the courts in favor of defendants that were applicable in death penalty cases only." Cannel, supra, comment 7 on N.J.S.A. 2C:11-3 (2013).

Lastly, defendant has not cited us to and our independent research fails to reveal that any state has taken the path defendant urges. Within the past 100 years, thirteen other states and the District of Columbia have repealed their respective death penalty provisions. Some of them previously had rejected the non-unanimity instruction in capital cases, and none of them has yet required such an instruction in non-capital cases.

For all these reasons, we are firmly convinced that a jury need not be instructed that it may return a non-unanimous

verdict on any triggering factor under the current statutory scheme for murder in New Jersey.[7]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Defendant has not argued that a non-unanimity instruction was required when the jury was considering the aggravating sentencing factor. We do not, therefore, address that issue except to note that much of the rationale for our decision would apply equally if such an argument had been raised.

A-3730-10T2