**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3742-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CARLOS I. MENJIVAR,
a/k/a IVAN MENJIVAR,

     Defendant-Appellant.

_____

Argued June 2, 2022 – Decided September 7, 2022

Before Judges Gilson, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-05-0762.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Monica do Outeiro, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lori Linskey, Acting Monmouth County Prosecutor, attorney; Mary R. Juliano, Special

Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a night of drinking, defendant Carlos Menjivar and two friends went to the apartment of one of the friends where they met a woman. The men and woman had sex together, after which one of the friends left. Later that day, police discovered the bodies of the other friend and the woman. They had been stabbed to death while lying in a bed.

A jury convicted defendant of both murders, and he was sentenced to life imprisonment without parole. He appeals from his convictions and sentence. We affirm his convictions but remand for resentencing on one of his murder convictions.

I.

We summarize the facts based on the evidence presented at hearings and the trial. In 2013, defendant lived with J.H. (Jimay).[1]

At approximately 10:30 p.m. on Saturday, March 23, 2013, Jimay drove his girlfriend, defendant, A.G. (Andre), and F.V. (Ferdinand) to a club called

---

[1] We use initials and fictitious names to protect the privacy interests of the witnesses and victims.

Bogart's. The group spent several hours at the club socializing and drinking. While at the club, Ferdinand had a confrontation with another man and that man was ejected from the club after some pushing and shoving.

That same night, M.C-M. (Maritza) dropped her three-year-old child at a friend's house. The friend had agreed to babysit the child overnight while Maritza went dancing at Bogart's.

When the club closed at approximately 2:00 a.m. on March 24, 2013, Jimay and his girlfriend drove defendant, Andre, and Ferdinand home. During that drive, Ferdinand arranged to meet Maritza, with whom he had a dating relationship, at his apartment. Ferdinand also invited defendant and Andre to join him and Maritza at the apartment. Jimay then dropped defendant, Andre, and Ferdinand at Ferdinand's apartment, where he saw a woman waiting outside the apartment.

Andre and defendant went into the apartment while Ferdinand and Maritza talked outside. While they were at the apartment, Andre saw that defendant had a knife up his sleeve. Ferdinand then came into the apartment, and the men had some drinks. Shortly thereafter, Maritza came into the apartment and the three men and Maritza had group sex.

A-3742-18

At approximately 5:30 a.m., Andre left the apartment and took a taxi home. While he was leaving, Andre heard Maritza ask for water and saw defendant bringing water to the bedroom for her.

When Maritza failed to pick up her child later that morning, the friend who was watching the child notified the police that Maritza was missing. Through inquiries, the police determined that Maritza had a dating relationship with Ferdinand, and in the afternoon of March 24, 2013, they went to Ferdinand's apartment to investigate. Ferdinand's apartment was in a house that was divided into five apartments. When the police arrived outside Ferdinand's apartment, they smelled the odor of "decomposition." After no one answered their knocks, the police forced the apartment door open. Inside, they found Ferdinand and Maritza dead in a bed. Both had been stabbed multiple times.

Subsequent autopsies showed that Ferdinand had been cut and stabbed twenty-eight times and Maritza had been cut and stabbed thirty-two times. A medical examiner testified that Ferdinand's cause of death was multiple sharp-force injuries to his head, neck, and chest. The examiner testified that Maritza died from bleeding and asphyxiation.

4

During the investigation of the murders, law-enforcement personnel spoke with Jimay, Andre, and defendant. In March 2013, Andre and defendant gave statements to the police.

In a statement given on March 26, 2013, defendant told the police that he had been at the club with Ferdinand and Andre on March 24, 2013, they had left around 2:00 a.m. to go to Ferdinand's home, Maritza had met them there, and the group had sex. Defendant claimed that, thereafter, Andre had left Ferdinand's apartment, he had left approximately five to ten minutes after Andre, and when he left Ferdinand and Maritza had been in the bedroom. Defendant also stated that as he had walked away from Ferdinand's apartment, he had seen four people approach the apartment house.

On December 16, 2014, defendant gave another statement to Detective Jose Rivera at the Monmouth County Sheriff's Office. Defendant had agreed to go to the Sheriff's Office to undergo a polygraph test. The interview was conducted in Spanish and was videotaped and transcribed. Ultimately, a polygraph examination was not conducted. Instead, Rivera explained how a polygraph test would be conducted and questioned defendant for approximately four and a half hours.

Rivera began by asking defendant to complete certain forms in connection with the polygraph test. The forms Rivera provided to defendant were completed in Spanish and later translated into English. One form asked defendant what questions he would like to be asked during the polygraph exam and whether he had any questions or concerns about the exam process. In response, defendant listed several questions he wanted to be asked. Defendant also completed a general truthfulness survey. Rivera also gave defendant a notepad and asked him to write in his own words why he had agreed to take the polygraph examination. Defendant wrote: "I came because the deceased family is harassing my family because I don't want [sic] for my family. I'm here because I have no option and I want peace for my family because I want to care for them." Defendant initially stated that he did not kill Ferdinand, explaining that he had gone to Ferdinand's apartment with Andre, they all had sex with Maritza, Andre left, and he left shortly thereafter between approximately 6:00 a.m. and 7:00 a.m.

Following that exchange, Rivera provided defendant with a Miranda[2] rights consent form. The form was in Spanish, and defendant stated that he knew how to read it. Defendant then read and initialed each right,

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

acknowledging that he had been advised of his constitutional rights, understood those rights, and wished to waive the rights and give a voluntary statement.

Defendant was also given and signed a forensic psychological detection and deception consent form (the polygraph form), which stated, in Spanish, that he was there "of his own free will," he was "free to leave at any time," he understood his rights, and he was willing to proceed with a polygraph examination. When Rivera presented the polygraph form to defendant, the following exchange took place:

[Defendant]: I can stop whenever I want to, right?

[Rivera]: What?

[Defendant]: I can also stop whenever I want to?

[Rivera]: What?

[Defendant]: Let's say I'm taking the test . . .

[Rivera]: Uh-huh.

[Defendant]: and I can . . . I can also stop talking . . .

[Rivera]: When taking the test, you have to answer yes or no during the test. But I am going to explain all of that to you.

During further questioning by Rivera, defendant claimed that Ferdinand had been killed because he had snitched on people who sold drugs. Defendant

also stated that he knew who killed Ferdinand and that they were paid professionals from Mexico. Rivera then asked defendant if he was physically present when Ferdinand was killed. Defendant admitted that he was present but explained that he had been caught by a group of men outside the apartment, taken back in, threatened, and held while they killed Ferdinand with a knife.

Rivera then reviewed defendant's <u>Miranda</u> rights for a second time by reading each of the rights aloud from the form and confirming that defendant understood and had initialed each statement on the <u>Miranda</u> rights consent form. The final statement on the form stated: "Having these rights in mind, I wish to waive them and give a voluntary statement and answer any questions." When Rivera asked defendant if he had provided his signature on the form after that statement and whether he understood it, defendant asked: "Does that mean I cannot change my mind?" Rivera responded: "Huh? This, what this says is that you understand. That having the rights in mind, you wish to waive them and provide a voluntary statement to talk to me and answer each question. Ok, is that right?" Defendant replied, "Uh-huh." Rivera then asked if defendant understood everything and defendant replied, "yes."

Thereafter, the questioning continued. In response to Rivera's questions, defendant recounted that when he had left Ferdinand's apartment, two men were

waiting for him and six more got out of a van and they grabbed him and held a machete-like knife against him. They then picked the lock to the apartment door and pushed him inside against a wall. Three men stayed with him and five went into the bedroom. Defendant claimed that he could hear the men "hacking" Ferdinand.

When Rivera questioned whether defendant was telling him the whole truth, defendant changed his story and ultimately claimed that the men had threatened and forced him to stab Ferdinand with a knife that they had given him. He explained that he had stabbed Ferdinand and then tossed the weapon on the floor. He claimed that he did not touch Maritza. Following the interview, defendant was arrested and charged with murder.

In 2015, defendant was indicted for two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). The grand jury also charged defendant with two aggravating factors in connection with the murder of Maritza. In that regard, the grand jury found that there was probable cause to believe that defendant had murdered Maritza to avoid detection for, and in the course of, the murder of Ferdinand. See N.J.S.A. 2C:11-3(b)(4)(f) and (g).

Before trial, defendant moved to suppress the statements he had given to law-enforcement officers. The trial court conducted a six-day evidentiary hearing and denied defendant's motion. The trial court concluded that defendant was not in police custody at the time he had made his statements voluntarily. The court also found no evidence to support a conclusion that defendant was forced to submit to either an interview or a polygraph examination. Instead, the trial court found that defendant voluntarily had gone to make the statement, had received the Spanish-language form telling him of his Miranda rights, and had signed the waiver.

At trial, a redacted video recording of defendant's December 16, 2014 statement was played for the jury. The jury was also given a transcript of the statement in English, and they had that transcript to reference while the video recording was played. The video recording and transcript used at trial omitted all references to the polygraph examination.

The trial was conducted over two months between October 16, 2018 and December 18, 2018. At trial, the jury heard testimony from over twenty witnesses, including Jimay, Andre, the medical examiner, law enforcement officers, and experts.

One of the experts who testified for the State was Federal Bureau of Investigation (FBI) Special Agent John Hauger. Hauger was proffered as an expert who would testify concerning the location of a cell phone that the State alleged defendant had in his possession on March 23 and 24, 2013.

Defendant moved in limine to exclude Hauger's testimony, and the trial court conducted an evidentiary hearing outside the presence of the jury. At that hearing, Hauger explained that he was a member of the FBI's Cellular Analysis Survey Team and that he had special training in cell-phone technology. He testified that he had personally tracked cell phones using Sprint per call measurement data (PCMD) about a hundred times. He also testified that he and other FBI agents had performed historical cell-site analysis using Sprint PCMD thousands of times. Hauger explained that normal call detail records provide the tower and location of the tower that the phone was using to connect to the network. He went on to explain that PCMD "gives you a distance from the tower based on an algorithm." Cell-phone companies use PCMD for network optimization and troubleshooting. The FBI uses the data, which it uploads to a mapping program developed by the FBI, to find people. Hauger stated that the FBI found PCMD to be accurate within a tenth of a mile, "in some cases, in

pinpointing the location of a phone." He went on to testify that he believed that the measurements from the tower were "more than likely accurate."

Hauger acknowledged that Sprint did not vouch for the accuracy of the latitudes and longitudes in its PCMD reports. Nevertheless, he explained that the FBI, while finding some discrepancies with latitude and longitude, believed the distances provided by PCMD were "accurate."

On cross-examination, Hauger acknowledged that there were no validation studies or published articles to support his assertions that Sprint PCMD was accurate. Instead, he explained that his accuracy claim was based on the FBI's "practical experience of locating people with [PCMD]."

After hearing the testimony at the evidentiary hearing, the trial court denied defendant's motion to exclude Hauger's testimony. The court found that Hauger's cell-site analysis methodology had gained sufficient general acceptance in courts throughout the country. The court concluded that any concerns about the data's imprecision as "best estimates" could be adequately addressed before the jury on cross-examination.

At trial, Hauger testified as an expert in historical cell-site analysis. Hauger explained that he had analyzed records provided by Sprint for a cell phone believed to be in the possession of defendant. He looked at the data for

12

that cell phone between approximately 2:00 a.m. and 10:00 a.m. on March 24, 2013. According to Hauger, the data showed that the phone was "somewhere very close" to Ferdinand's apartment between 2:14 a.m. to 7:31 a.m. By 7:54 a.m., the phone was closer to defendant's residence. Hauger also explained that defendant's residence was about one mile from Ferdinand's apartment. He acknowledged that there could be an error rate as much as one-tenth of a mile in his analysis.

The jury also heard testimony from Kelly Walker, the records custodian for Sprint Corporation. Walker testified that PCMD is mainly used internally to make sure the network is working properly. Walker stated that Sprint has a disclaimer that states that its PCMD data is used to estimate locations of mobile devices, but Sprint does not guarantee the accuracy of the location information. Walker also explained that Sprint does not use the data to track the locations of people using their cell phones.

In his case, defendant called Spencer McInvaille as an expert in cellular analysis. McInvaille opined that historic cell detail records cannot be used to "precisely locate a device." He also testified that Sprint does not acknowledge the accuracy of PCMD and that he was not aware of any scientific or engineering studies demonstrating the accuracy of PCMD.

A-3742-18

One of the officers who testified at trial was a retired detective who testified about a 2009 narcotics investigation. The retired detective explained that the investigation involved Ferdinand and six other defendants. According to the retired detective, Ferdinand was not a confidential informant nor a cooperating witness in the investigation. The retired detective also stated that he knew of no other cases involving Ferdinand and was not aware of Ferdinand snitching on any drug dealers or other persons in Long Branch.

During his case, defendant called an investigator and during the investigator's testimony, the 2009 judgments of conviction were admitted into evidence. The judgments stated that Ferdinand had received a probationary sentence, while a co-defendant named Manuel Savedra had been sentenced to seven years in prison. In closing argument, defense counsel contended that Ferdinand had been killed by hired professionals in retaliation for snitching on Savedra.

After the State and the defense had put in their evidence, the trial court instructed the jury. Before giving those instructions, the court informed counsel that it would include a duress instruction because defendant had claimed that he had been forced to murder Ferdinand. Defense counsel did not object to that

14

instruction. Nor did defense counsel object to the verdict sheet that was given to the jury.

After hearing closing arguments and the instructions by the court, the jury found defendant guilty of all charges. The jury also found both aggravating factors related to the murder of Maritza.

At sentencing, the trial court merged the weapons convictions into the murder convictions. On the conviction for the murder of Ferdinand, defendant was sentenced to life in prison with thirty years of parole ineligibility. On the conviction for the murder of Maritza, defendant was sentenced to life in prison without the possibility of parole. The sentences for the murder convictions were ordered to be served consecutively. Defendant was also ordered to pay $5,000 in restitution to the Victims of Crime Compensation Office. Defendant now appeals from his convictions and sentence.

## II.

In a brief filed by his appellate counsel, defendant presented four arguments for our consideration:

> POINT I – THE DEFENDANT'S DECEMBER 2014 STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE STATE DID NOT PROVE THAT DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHTS AGAINST SELF-INCRIMINATION. WHEN DEFENDANT

15

TWICE ASKED WHETHER HE COULD STOP THE INTERROGATION AT ANY TIME AND REFUSE TO ANSWER QUESTIONS, A DETECTIVE TOLD HIM THE FIRST TIME THAT HE COULD NOT DO SO AND HAD TO ANSWER QUESTIONS, AND, THE SECOND TIME, IGNORED THE DEFENDANT'S QUESTION AND ANSWERED AS IF A DIFFERENT QUESTION HAD BEEN ASKED. MOREOVER, THE DETECTIVE COERCED THE DEFENDANT INTO CONFESSING BY PROMISING TO "HELP" DEFENDANT.

POINT II – THE EXPERT OPINION OF AN FBI AGENT REGARDING THE COVERAGE RANGE OF SPRINT CELL-PHONE TOWERS AND DEFENDANT'S LIKELY LOCATION AT THE CRIME SCENE AT A PARTICULAR TIME WAS IMPERMISSIBLY UNRELIABLE AND A "NET OPINION" BECAUSE IT WAS NOT BASED UPON RELIABLE EVIDENCE OF THAT RANGE BUT, RATHER, ON DATA THAT SPRINT ITSELF REFUSED TO CERTIFY AS ACCURATE TO DETERMINE A PHONE'S LOCATION.

POINT III – THE MANNER IN WHICH DURESS WAS PRESENTED TO THE JURY ON THE VERDICT SHEET, AND IN THE INSTRUCTION, DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL ON THE COUNT OF THE INDICTMENT CHARGING DEFENDANT WITH THE MURDER OF [FERDINAND].

POINT IV – THIS COURT SHOULD REJECT STATE V. TROXELL, AND HOLD THAT IT IS IMPROPER TO INSTRUCT THE JURY TO BE UNANIMOUS IN ORDER TO REJECT AN AGGRAVATING FACTOR REGARDING A LIFE-WITHOUT-PAROLE (LWOP) SENTENCE, WHEN, IN FACT, AS IN DEATH-

16

PENALTY JURISPRUDENCE -- WHICH IS THE BASIS FOR THE LWOP PROCEDURE -- THE ONLY UNANIMITY REQUIREMENT IS TO <u>FIND</u> SUCH A FACTOR, NOT TO REJECT IT; MOREOVER, THE AGGREGATE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE AND THE RESTITUTION ORDER IS UNACCOMPANIED BY A FINDING OF AN ABILITY TO PAY.

Defendant also filed his own supplemental brief where he presented the following arguments:

<u>POINT I</u>: THE COURT MUST "MODIFY" THE SENTENCE IN ACCORDANCE WITH <u>N.J.S.A. 2C:44-7</u> TOWARDS ACCORD AND SATISFACTION OF THE CONVICTION AS A WHOLE. BECAUSE AN <u>ILLEGAL SENTENCE</u> WAS IMPOSED, DEFENDANT HAS NO HISTORY OF PRIOR CRIMINAL DELINQUENCY OR CRIMINAL ACTIVITY [] CAUSING A WRONGFUL CONVICTION.

A. <u>During Sentencing, the court did not comply with Rule 3:21-4(b) since the court did not address the defendant personally and ask the defendant if he wished to make a statement in his own behalf and to present any information in mitigation of punishment</u>.

B. <u>When defendant was initially arrested and detained back on 12/17/2014 defendant was 22 years old[,] a young offender, the Judgment of conviction denotes that defendant's date of birth is 10/29/1992 [], was only eligible for a sentence pursuant to N.J.S.A. 2C:43-5, which is consistent with Assembly Bill No. 4373</u>.

C. Instant convictions for Count 1 to Count 2 are offences closely related, which the court below [discretionally] decided to adjudicate split sentences.

D. The Sentencing Court violated Rule 3:21-4(f).

E. Mitigating Factors outweigh Aggravating factor to lower the Count 1 and Count 2 [] one degree Lower pursuant to N.J.S.A. 2C:44-1f.(2).

F. Cruel And Unusual Punishment When the Court imposed 'natural life'.

POINT II: SUPPLEMENTING COUNSELED BRIEF ARGUMENT [] TO ALERT THIS COURT OF THE PUBLISHED OPINION OF THE APPELLATE DIVISION IN STATE V. ANTHONY SIMS, JR., DOCKET NO. A-2641-17T2, DECIDED JANUARY 4, 2021; ET AL.

In summary, defendant makes five arguments, contending that (1) his December 2014 statement should have been suppressed; (2) Agent Hauger should not have been allowed to testify; (3) the trial court erred in instructing the jury on the defense of duress; (4) the trial court erred in instructing the jury on the aggravating factors related to the murder of Maritza; and (5) his sentence was illegal or had other problems that require a resentencing. We reject all these arguments, except for two matters concerning defendant's sentence. Accordingly, we affirm his convictions and remand for resentencing on the conviction for the murder of Ferdinand.

A. Defendant's December 2014 Statement.

The Fifth Amendment of the United States Constitution guarantees all persons with the privilege against self-incrimination. U.S. Const. amend. V. This privilege applies to the states through the Fourteenth Amendment. U.S. Const. amend. XIV; Griffin v. California, 380 U.S. 609, 615 (1965); State v. Clark, 251 N.J. 266, 291 (June 29, 2022). Moreover, in New Jersey, there is a common-law privilege against self-incrimination, which has been codified in statutes and rules of evidence. N.J.S.A. 2A:84A-19; N.J.R.E. 503; State v. O.D.A-C., 250 N.J. 408, 420 (2022).

If a person is not in custody, the privilege against self-incrimination must generally be invoked. See State v. Ahmad, 246 N.J. 592, 610 (2021) (explaining that "Miranda is triggered only when a person is in custody and subject to questioning by law enforcement"). When an individual is subject to custodial interrogation, that person is entitled to certain warnings in accordance with Miranda. O.D.A.-C., 250 N.J. at 420 (citing State v. Hreha, 217 N.J. 368, 382 (2014)).

After receiving Miranda warnings, a person may knowingly and intelligently waive those rights and agree to answer questions or make statements. To admit the statement into evidence, the State must establish

beyond a reasonable doubt that the waiver of the <u>Miranda</u> rights was given intelligently, knowingly, and voluntarily in light of the totality of the circumstances. <u>State v. Sims</u>, 250 N.J. 189, 211 (2022); <u>State v. Nyhammer</u>, 197 N.J. 383, 402-03 (2009). "Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a <u>Miranda</u> waiver is valid." <u>O.D.A.-C.</u>, 250 N.J. at 421. "Those factors include the suspect's 'education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems,' how explicit the waiver was, and the amount of time between the reading of the rights and any admissions." <u>Ibid.</u> (quoting 49 <u>Geo. L.J. Ann. Rev. Crim. Proc.</u>, 233-36 (2020)).

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession." <u>Ibid.</u> The State must "prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." <u>Ibid.</u> (quoting <u>State v. L.H.</u>, 239 N.J. 22, 42 (2019)). In assessing voluntariness, the totality-of-the-circumstances test also applies and "[t]here is a substantial overlap [with] the factors that" apply to a waiver analysis. <u>Ibid.</u> (citing <u>State v. Tillery</u>, 238 N.J. 293, 316-17 (2019)).

When Miranda warnings are given, they must be given properly. O.D.A.-C., 250 N.J. at 424. Accordingly, a law-enforcement officer cannot directly contradict the warnings. Ibid.; see also L.H., 239 N.J. at 44 (explaining that "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other" (quoting State ex rel. A.S., 203 N.J. 131, 151 (2010))).

In reviewing a trial court's decision on a motion to suppress a statement, appellate courts generally defer to the factual findings of the trial court when they are supported by sufficient credible evidence in the record. Sims, 250 N.J. at 210; Nyhammer, 197 N.J. at 409 (citing State v. Elders, 192 N.J. 224, 243-44 (2007)). Moreover, appellate courts defer to a trial judge's findings "which are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy[.]" State v. Davila, 203 N.J. 97, 109-10 (2010) (quoting State v. Johnson, 42 N.J. 146, 161-62 (1964)). Legal determinations are reviewed de novo. Sims, 250 N.J. at 218.

Defendant argues that he did not knowingly or voluntarily give his December 2014 statement to Detective Rivera because Rivera provided deceptive answers when defendant twice asked if he could stop answering

questions. Defendant also contends that Rivera improperly promised to help him.

Before the trial court, defendant moved to exclude all his statements and consequently his arguments were not focused on the specific issues he raises on this appeal concerning the December 2014 statement. Addressing the December 2014 statement, the trial court found that defendant had appeared voluntarily, in an effort to eliminate himself as a suspect and because he and his family were being harassed by Ferdinand's family. In addition, the trial court found that defendant had been given Miranda warnings twice during his statement and defendant had stated that he understood and waived those warnings. Accordingly, the trial court also found that defendant had knowingly, voluntarily, and intelligently waived his Miranda rights.

Initially, we hold that whether defendant was in custody when he gave the statement in December 2014 is not the determinative issue. We agree with the trial court that when defendant first appeared, he appeared voluntarily, and he was not in custody. Early in the questioning, however, Detective Rivera gave defendant Miranda warnings. After defendant admitted he was present when Ferdinand was murdered, Rivera again reviewed the Miranda warnings with defendant to confirm that he understood and was waiving his rights.

22

Consequently, the determinative issue is whether any comment made by Rivera rendered defendant's statement involuntary or unknowing.

Reviewed in the totality of the circumstances, there was substantial credible evidence supporting the trial court's finding that the defendant's statement was given knowingly, voluntarily, and intelligently. Moreover, when we focus on the specific challenges raised by defendant on this appeal, we hold that Rivera's comments did not undercut defendant's waiver of his Miranda rights.

On this appeal, defendant first challenges the response Rivera made to defendant while defendant was reviewing the polygraph form. In reviewing that form, defendant asked: "I can stop whenever I want to, right?" After twice asking "What?," Rivera responded: "When taking a test, you have to answer yes or no during the test. But I am going to explain all of that to you." Considered in the totality of the circumstances, Rivera's response did not undercut the Miranda warnings. Just prior to the challenged exchange, Rivera had presented defendant with a Miranda waiver form, defendant had reviewed all his Miranda rights, initialed all those rights, and agreed to speak with Rivera. Accordingly, defendant's question related to the polygraph form and Rivera's answers was not misleading relative to the Miranda rights. Considered in context, the response

by Rivera did not undercut defendant's understanding of his <u>Miranda</u> rights and, in particular, his right to stop answering questions at any time he chose.

Defendant's second challenge is to a response Rivera gave when Rivera readministered defendant's <u>Miranda</u> rights. After defendant admitted that he was present when Ferdinand was murdered, Rivera reviewed defendant's <u>Miranda</u> rights a second time. Specifically, Rivera read each statement on the form aloud to defendant and defendant confirmed that he had initialed and understood each statement. When Rivera got to the last part of the <u>Miranda</u> waiver form, the following exchange took place:

> [Rivera]: Having these . . . these rights in mind, I wish to give up these rights and make a voluntary statement and answer any question. Is that your signature? Do you understand?
>
> [Defendant]: Does that mean I cannot change my mind? Right?
>
> [Rivera]: Uh? This, what this says is that you understand. That having the rights in mind, you wish to waive them and provide a voluntary statement to talk to me and answer each question. Ok, is that right?
>
> [Defendant]: Uh-huh.
>
> [Rivera]: Ok, and that is your signature, right? Today's date and the time when you signed it. Do you understand everything?
>
> [Defendant]: Yes.

24

Rivera's comment was not directly responsive to defendant's question of whether defendant could change his mind. Nevertheless, considered in the totality of the circumstances, Rivera's response did not undermine defendant's waiver of his <u>Miranda</u> rights and make the statement inadmissible. Rivera expressly explained that defendant was agreeing to waive his rights and to provide a voluntary statement. Rivera's comment was made after he had already reviewed each of defendant's constitutional <u>Miranda</u> rights and had confirmed with defendant that he understood those rights.

Finally, defendant contends that Rivera's comments that he would help defendant rendered defendant's statement involuntary and inadmissible. The specific comment defendant objects to was made after defendant admitted to being present in the apartment with eight intruders when the murders occurred. Rivera told defendant that he did not believe defendant was telling the whole truth and Rivera then commented that "I also promised I am going to do everything, everything I can to help you out; everything I can to help you out today. But what I need from you is the truth, the truth." Shortly thereafter, defendant admitted to stabbing Ferdinand but claimed he was forced to do it.

Rivera's comment to help defendant did not include any specific promise of the type of help Rivera would provide. Moreover, we note that at other times

during the questioning in December 2014, Rivera made other references to helping defendant. Those comments were also not specific promises of help. Rivera's comments were qualitatively different from a false promise of leniency or a promise that defendant's statement would not be used against him. Consequently, the comments were not like the statements or promises that have been held to undermine Miranda warnings. See O.D.A.-C., 250 N.J. at 423. Instead, Rivera's comment is more analogous to an appeal "to [the suspect's] sense of decency and urging him to tell the truth for his own sake." L.H., 239 N.J. at 44 (alteration in original) (quoting State v. Miller, 76 N.J. 392, 405 (1978)). In short, Rivera's comments to help defendant were not of a nature to cause defendant's will to be overborne and induce an involuntary statement.

We also reject defendant's argument raised in his pro se brief concerning this court's decision in State v. Sims, 466 N.J. Super. 346 (App. Div. 2021). In Sims, this court held that to make a knowing and intelligent waiver of his or her Miranda rights, a suspect who is under arrest must be informed of the crime for which he or she was arrested, even if no formal complaint had yet been issued. 466 N.J. Super. at 354. The New Jersey Supreme Court, however, reversed our decision in Sims and held that a suspect needs to be advised about pending charges but not that he or she might or likely will be charged with a crime. Sims,

26

250 N.J. at 214-16. It is undisputable that defendant had no pending charges when he initially appeared on December 16, 2014, to give a statement and take a polygraph exam. Consequently, during defendant's December 2014 statement there was no violation of the rule identified by the Supreme Court in Sims.

In summary, defendant was advised of his Miranda rights, he acknowledged that he understood those rights, and he knowingly, intelligently, and voluntarily waived those rights and provided a statement. Accordingly, the trial court did not err in admitting the redacted videotape and transcript of defendant's December 2014 statement.

B.    Agent Hauger's Testimony.

Defendant argues that the trial court erred by admitting Agent Hauger's expert testimony, which relied on PCMD to place the cell phone defendant was alleged to possess within one-tenth of a mile of Ferdinand's apartment for nearly two hours after Andre left the apartment on March 24, 2013. Defendant contends that Hauger's testimony was not sufficiently reliable to be admitted under N.J.R.E. 702.

Expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the proposed expert has the requisite

"knowledge, skill, experience, training or education" to form an expert opinion. N.J.R.E. 702. There are three requirements for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Kelly, 97 N.J. 178, 208 (1984).]

In criminal cases, New Jersey applies the Frye test to determine whether the field testified to is generally accepted within the relevant scientific community. State v. Cassidy, 235 N.J. 482, 491-92 (2018) (citing State v. J.L.G., 234 N.J. 265, 280 (2008)); see also Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

Our Supreme Court has explained:

> "Proof of general acceptance within a scientific community can be elusive," and "[s]atisfying the test involves more than simply counting how many scientists accept the reliability of the proffered [technique]." General acceptance "entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience." The proponent of the technique has the burden to "clearly establish" general acceptance and may do so using "(1)

expert testimony, (2) scientific and legal writings, and (3) judicial opinions."

[Cassidy, 235 N.J. at 492 (alterations in original) (citations omitted).]

"Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question [that appellate courts] review de novo." J.L.G., 234 N.J. at 301. "When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." State v. Harvey, 151 N.J. 117, 167 (1997). The determination of whether the witnesses qualify to present expert testimony is reviewed for an abuse of discretion. State v. Rosales, 202 N.J. 549, 562-63 (2010).

Initially, we reject defendant's argument that Hauger's testimony was a net opinion. "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "An expert must 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115,

144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)).

Hauger testified as an expert in the field of historical cell-site analysis. He identified the factual basis for his conclusions, explaining that he relied on Sprint PCMD. We have held that the field of historical cell-site analysis is at a state of the art that is sufficiently reliable to allow a qualified expert's testimony. State v. Burney, 471 N.J. Super. 297, 321-23 (App. Div. 2022). In that regard, numerous federal and other state courts have allowed the admission of expert testimony regarding historical cell-site data analysis. See United States v. Hill, 818 F.3d 289, 298 (7th Cir. 2016); United States v. Schaffer, 439 Fed. App'x 344, 347 (5th Cir. 2011); United States v. Jones, 918 F. Supp. 2d, 1, 5 (D.D.C. 2013); United States v. Evans, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012); State v. Johnson, 797 S.E.2d 557, 563 (W.Va. 2017); Pullin v. State, 534 S.E.2d 69, 71 (Ga. 2000); Wilson v. State, 195 S.W.3d 193, 200-02 (Tex. Crim. App. 2006).

Defendant does not challenge that historical cell-site analysis is at a state of the art that is sufficiently reliable. Instead, defendant challenges the reliability of the Sprint PCMD on which Hauger relied in giving his expert opinion.

Hauger testified that he is an FBI agent with special training and experience as part of the FBI's Cellular Analysis Survey Team. Hauger explained that historical call detail record analysis determines "a general geographic area of where the phone was when it did something" and is not used to precisely locate a phone. Hauger also acknowledged, as confirmed by the testimony of a Sprint representative, that Sprint uses its PCMD for system optimization and not for locating phones. Moreover, Sprint disclaims the accuracy of PCMD in locating phones. Hauger also acknowledged that there were no underlying validation studies for using PCMD to locate a phone. Instead, Hauger explained that his opinion was based on his experience of using PCMD to locate Sprint phones about 100 times throughout his career. He also relied on the FBI's general experience where it has used PCMD to locate phones in thousands of situations.

This case does not require us to determine whether Hauger's testimony and his reliance on Sprint's PCMD was sufficiently reliable. Instead, we determine that the admission of Hauger's expert testimony was not reversible error. Any error in admitting Hauger's testimony was harmless given defendant's own admissions. In his statement, defendant acknowledged he was present when Ferdinand and Maritza were murdered. Hauger's opinion went to

31

that very issue in that it placed a cell phone in defendant's possession in Ferdinand's apartment when only defendant, Ferdinand, and Maritza were present in the apartment. Consequently, Hauger's expert testimony only helped to confirm defendant's own admission.

C.   The Jury Charge and Verdict Sheet Concerning the Defense of Duress.

Defendant contends that the jury instructions and verdict sheet failed to properly inform the jury concerning the possible defense of duress related to the murder of Ferdinand. We disagree and reject this argument.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting Green, 86 N.J. at 287-88).

If a defendant does not object when a charge is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting Singleton, 211 N.J. at 182). When there is no objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have

32

been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alternation in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).

In reviewing a claim of error related to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). In addition, the error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

"A verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions." State v. Gandhi, 201 N.J. 161, 196 (2010). When the defendant does not object to an interrogatory on the verdict sheet, appellate courts review for plain error. State v. Vasquez, 265 N.J. Super. 528, 547 (App. Div. 1993). The "inquiry focuses on whether the jury understood the elements [of the offense] as instructed by the judge, and was not

33

misled by the verdict sheet." Gandhi, 201 N.J. at 197. "When there is an error in a verdict sheet but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless." State v. Galicia, 210 N.J. 364, 387 (2012).

At the end of the presentation of evidence at defendant's trial, the trial court determined that it would instruct the jury on the defense of duress concerning the murder charge related to Ferdinand. The trial court reasoned that the defense of duress had effectively been presented in defendant's statements because during those statements defendant contended that he had been coerced and threatened into stabbing Ferdinand. The court then instructed the jury on duress using the Model Jury Charge for Duress and modifying it to the facts of defendant's case. In that regard, the trial court instructed the jury:

> The State has the burden to pro[ve] beyond a reasonable doubt each element of the offense of murder. [The] State also has the burden to disprove, beyond a reasonable doubt, the defense of duress.
>
> If you find the State has proven beyond a reasonable doubt each element of the offense charged and that the State has disproved beyond a reasonable doubt the defense of duress, you must find the defendant guilty of murder, and answer no to question [1a.] on the verdict sheet.
>
> If, however, you determine that the State has proven beyond a reasonable doubt each element of the offense

34

of murder of [Ferdinand], but has failed to disprove the defense of duress, then you must find the defendant guilty of manslaughter, and answer yes to question [1a.] on the verdict sheet.

Finally, as I previously instructed, if you determine that [the] State has failed to prove beyond a reasonable doubt one or more of the elements of murder of [Ferdinand], you must find the defendant not guilty of murder.

Question one on the verdict sheet asked the jury how it found as to whether defendant committed the murder of Ferdinand. The jury then had the option of answering not guilty or guilty. Question 1a. of the verdict sheet asked the jury whether it found that defendant had committed the murder of Ferdinand "because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to overcome?" The jury then had the option of answering no or yes.

Defendant did not object to the jury charge or the verdict sheet concerning the defense of duress. On appeal, however, defendant now argues that "[t]he manner in which duress was presented to the jury on the verdict sheet, and in the instruction" deprived him of a fair trial. In that regard, defendant contends that duress works like passion/provocation and that the defense of duress should

have been presented to the jury in the same way that passion/provocation would have been presented.

We reject defendant's argument and hold that the trial court properly instructed the jury that the State had the burden to disprove duress beyond a reasonable doubt. We also hold that the jury instructions concerning duress, which were both read to and given to the jury, were correct. The instructions clearly explained that duress acted as a defense, which would have reduced the charge of murder to manslaughter. See N.J.S.A 2C:2-9(b) (explaining that "[i]n a prosecution for murder, the defense [of duress] is only available to reduce the degree of the crime to manslaughter").

Likewise, there was no plain error on the verdict sheet. The verdict sheet was crafted to ensure that the jury did not find defendant guilty of murder without considering the defense of duress. In addition, while the verdict sheet itself did not mention manslaughter, the instructions clearly did. Accordingly, we find no plain error in the jury instructions or verdict sheet concerning the defense of duress.

D.    The Instructions Concerning the Triggering and Aggravating Factors Related to the Murder of Maritza.

In instructing the jury concerning the charge of the murder of Maritza, the trial court explained that the jurors had to unanimously find defendant guilty of

purposely or knowingly causing the death of Maritza. The trial court also instructed the jury that they were to consider the triggering and aggravating factors that, if found, would require defendant to be sentenced to life without the possibility of parole. Accordingly, the trial court instructed the jury that they must unanimously determine whether defendant had acted by his own conduct in causing the death of Maritza. The court also instructed the jury that they were to unanimously determine whether defendant had committed the murder of Maritza for the purpose of escaping detection of or apprehension for the murder of Ferdinand and whether defendant had committed the murder of Maritza while he was engaged in the commission of, or an attempt to commit, the murder of Ferdinand. Defendant did not object to those instructions or the related questions on the verdict sheet.

The jury then found that defendant had murdered Maritza. The jury also found the triggering factor that defendant acted by his own conduct in causing the death of Maritza. In addition, the jury found two aggravating factors, finding that defendant had committed the murder of Maritza for the purpose of escaping detection of or apprehension for the murder of Ferdinand and defendant had murdered Maritza while he was engaged in the murder of Ferdinand. Those findings required that defendant be sentenced to life without the possibility of

37

parole for the murder of Maritza. See N.J.S.A. 2C:11-3(b)(4); State v. Baylor, 423 N.J. Super. 578, 597 (App. Div. 2011).

On this appeal, defendant argues that his life-without-parole sentence for the murder of Maritza should be reversed because the jury was not told that it could reject the triggering or aggravating factors without being unanimous. We have previously rejected that argument. See State v. Troxell, 434 N.J. Super. 502, 519 (App. Div. 2014). In Troxell, we held that trial courts are not required to provide a non-unanimous instruction regarding the triggering factor that made defendant eligible for a mandatory life sentence without parole. Ibid. We also noted that the defendant in Troxell did not argue that a non-unanimous instruction was required when the jury was considering the aggravating sentencing factors. Id. at 521 n.7. Nevertheless, we explained that the rationale for our decision in Troxell would apply equally to an argument concerning a non-unanimous instruction related to aggravating sentencing factors. Ibid. In short, as defendant concedes, to prevail on his argument we would have to reverse our decision in Troxell.

We decline to reverse our decision in Troxell. Instead, we agree with the rationale in Troxell and hold that it equally applies to aggravating factors, as well as triggering factors, for the purpose of determining whether defendant

should be sentenced to life without parole. In <u>Troxell</u>, we were "firmly convinced that a jury need not be instructed that it may return a non-unanimous verdict on any triggering factor under the current statutory scheme for murder in New Jersey." <u>Id.</u> at 521. <u>Troxell</u> was decided in 2014 and since then the Legislature has not amended the statute to impose a requirement for non-unanimous instructions for cases being considered for a life-without-parole sentence under N.J.S.A. 2C:11-3(b)(4). We presume that the Legislature is aware of our decision in <u>Troxell</u> and, if they disagreed, they would have acted to change the statute. <u>State v. J.V.</u>, 242 N.J. 432, 445 (2020). Accordingly, we reject defendant's argument and affirm his sentence of life without parole on the conviction for the murder of Maritza.

E. The Sentence and Restitution.

As previously noted, defendant's weapon convictions were merged into his murder convictions. On the conviction for the murder of Ferdinand, defendant was sentenced to life in prison with thirty years of parole ineligibility. On the conviction for the murder of Maritza, defendant was sentenced to life in prison without the possibility of parole. The sentence for the murder of Ferdinand was ordered to be served consecutive to the sentence for the murder of Maritza. Defendant was also ordered to pay $5,000 in restitution to the

39

Victims of Crime Compensation Office, which has paid for the funeral of Ferdinand.

In his supplemental brief, defendant challenges his sentence contending that (1) he was not given an opportunity to make a statement; (2) he should have been sentenced to a youth correctional facility; (3) his sentences should have been run concurrently; (4) additional mitigating factors should have been found and his sentence should have been reduced to the second-degree range; (5) his sentence constituted cruel and unusual punishment; and (6) his age (defendant was twenty-two years old when he committed the murders) should have been considered and mitigating factor fourteen should be applied retroactively. In addition, defendant challenges the award of restitution because the sentencing court did not make a finding that defendant had the ability to pay restitution.

We reject most of these arguments and determine that they lack sufficient merit to warrant discussions in a written opinion. See R. 2:11-3(e)(2). Two matters, however, require a remand.

First, we remand for a resentencing on the conviction for the murder of Ferdinand. In doing so, we note that the State concedes that that sentence was incorrect. On the conviction for the murder of Ferdinand, defendant was sentenced to life in prison with thirty years of parole ineligibility. The murder

statute, N.J.S.A. 2C:11-3(b)(1), states that if convicted of murder, a person "shall be sentenced . . . to a term of [thirty] years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between [thirty] years and life imprisonment of which the person shall serve [thirty] years before being eligible for parole."  A sentence for murder, however, is also subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Accordingly, the murder statute and NERA must be read together, and a sentencing court can impose a term of between thirty years and life but must set a minimum term of ineligibility of either eighty-five percent of the term or thirty years, whichever is longer.  See Cannel, N.J. Criminal Code Annotated, cmt. 4 on N.J.S.A. 2C:11-3 (2021) (explaining that a sentencing court "may set a maximum term between [thirty] years and life and then must set a minimum term of [eighty-five percent] of the term set or [thirty] years, whichever is longer").

Under NERA, "a sentence of life imprisonment shall be deemed to be [seventy-five] years." N.J.S.A. 2C:43-7.2(b).  Accordingly, the period of parole ineligibility for defendant's conviction for the murder of Ferdinand should have been eighty-five percent of seventy-five years or sixty-three years and nine months.  See State v. Ramsey, 415 N.J. Super. 257, 272 (App. Div. 2010)

(remanding case for resentencing where defendant was convicted of murder and the sentencing court imposed a life sentence with a thirty-year period of parole ineligibility instead of sixty-three years and nine months as required by NERA).

Because we are remanding for resentencing on the conviction for the murder of Ferdinand, the court will also need to apply and consider mitigating factor fourteen. See State v. Lane, 251 N.J. 84, 97 n.3 (2022). The sentencing court should also impose the five-year term of parole supervision as required by N.J.S.A. 2C:43-7.2(c). In remanding for a resentencing on the murder conviction of Ferdinand, we recognize that the resentence will have no practical effect. We have affirmed the conviction and sentence for the murder of Maritza. Because the sentence on that conviction was life imprisonment without the possibility of parole, the resentencing on the conviction for the murder of Ferdinand will have no impact on the total amount of time that defendant will serve. Nevertheless, the sentence for the conviction of the murder of Ferdinand should comply with the governing statutes.

Second, we remand and direct the sentencing court to conduct an ability-to-pay hearing concerning the restitution award. See N.J.S.A. 2C:44-2(b). Although N.J.S.A. 2C:11-3c states that a defendant "shall be required to pay restitution," N.J.S.A. 2C:44-2 sets forth the criteria for imposing restitution.

42

Sections (b) and (c) of N.J.S.A. 2C:44-2 require an assessment of a defendant's ability to pay.

## III.

In summary, we affirm all of defendant's convictions. We also affirm defendant's sentence for the conviction of the murder of Maritza. We remand for the limited purposes of resentencing defendant on the conviction for the murder of Ferdinand and for an ability-to-pay hearing on the restitution award.

Affirmed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

43

A-3742-18